T.C. Memo. 2015-185

UNITED STATES TAX COURT

HARVEY L. TUCKER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19797-13.                    Filed September 22, 2015.

<u>Merritt A. Gardner</u>, for petitioner.

<u>Miriam C. Dillard</u> and <u>A. Gary Begun</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  Respondent determined deficiencies in and penalties with

respect to petitioner's Federal income tax as follows:[1]

_____

[1]All monetary amounts are rounded to the nearest dollar.

**[*2]**

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $610,541 | $122,120 |
| 2005 | 714,979 | 142,996 |
| 2006 | 152,851 | 30,570 |

After concessions, the issues remaining for decision are:

(1) whether petitioner is entitled to a net operating loss carryback deductions from tax year 2008 for tax years 2004-06 in excess of the amounts respondent determined, and

(2) whether petitioner is liable for section 6662(a)[2] accuracy-related penalties for tax years 2004-06.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Florida when the petition was filed.

---

[2] All section references are to the Internal Revenue Code in effect at all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Petitioner does not contest respondent's determination to increase qualified dividend income. Therefore, we deem petitioner concedes the issue. Respondent also determined a computational adjustment to petitioner's domestic production activities deduction for the 2005 tax year.

**[*3]**   The issues in this case are based on a substantial writedown of properties held by petitioner's solely owned S corporation, Paragon Homes Corp. (Paragon), in 2008.

Paragon was a residential land development and home building company that owned several properties in Hillsborough County, Florida.  These properties consisted of multiacre tracts, platted subdivisions, lots and single-family homes. Petitioner was the president, director, and sole shareholder of the company.  In 2004-06, the years at issue, Paragon was a solvent company duly meeting its payroll, mortgage obligations, rent, insurance premiums, real estate taxes, and utility bills.

Paragon executed mortgages with several banks, including Platinum Bank, Branch Banking & Trust Co. (BB&T), Wachovia Bank (Wachovia), and Fidelity Bank (Fidelity), to purchase its real property.  All mortgage obligations on the properties were with recourse to Paragon.  Petitioner personally guaranteed the mortgage loans on Paragon's properties.

In 2007 and 2008 the residential real estate market in Hillsborough County began declining, with annual housing starts down 79% from their peak, annual closings down 65%, and the median home price for a single family unit down 36% from June 2006.

**[*4]**  As guarantor of Paragon's mortgage loans, petitioner felt the need to complete work on its properties in order to sell them and use the proceeds to reduce or extinguish the mortgage liabilities.  Under these circumstances, Paragon sold one of its properties, the Huntley property, on August 29, 2008, for a contract price less than the mortgage encumbering the property.  As a result of the sale, the mortgagee, Platinum Bank, released its mortgage to permit the sale to proceed.  Initially, the parties disagreed as to whether the remainder of the debt was released with the sale of the property.  Now the parties agree that it was not.

In 2008 many of Paragon's other properties were encumbered by debt that exceeded their value as a result of the market downturn.  By April 2008 petitioner stopped making payments on mortgage loan balances to BB&T.  In September BB&T filed a foreclosure suit, case No. 08-CA-22300, against petitioner and Paragon in the Circuit Court for Hillsborough County, Florida.  One month later, Platinum Bank initiated foreclosure proceedings against petitioner and Paragon at case No. 08-CA-25122, in the same court.

Petitioner presented the report and testimony of an expert witness, Jamie Myers, to show that by the end of 2008 the balance due on mortgage loans for many of Paragon's properties exceeded their fair market value.  Petitioner's expert testified that there was some demand for the properties at the end of the 2008 tax

[*5] year and that the properties had value. He appraised the properties as follows for this period:

| Name | FMV | Balance due on mortgage | Bank |
|---|---|---|---|
| Long Pond / Hunter's Lake | $1,250,000 | $1,859,725 | Platinum |
| Culbreath Estates | 520,000 | 591,244 | Platinum |
| Massaro II / Meadow Chase | 475,000 | 643,500 | BB&T |
| Amberwave Estates--Lot 1 | 127,500 | 115,000 | BB&T |
| Walden Reserve--Lot 11/ Block 2 | 270,000 | 270,113 | BB&T |
| Walden Reserve--Lot 19/ Block 1 | 260,000 | 198,298 | Wachovia |
| Walden Reserve--Lot 15/ Block 2 | 270,000 | 206,478 | Fidelity |
| Walden Reserve--Lot 3/Block 2 | 270,000 | 192,524 | Fidelity |
| Walden Reserve--Lot 8/Block 2 & Walden Reserve Vacant Lots | 1,180,000 | 2,126,158 | Fidelity |
| Misty Glen--Lot 5/Block B | 270,000 | 223,000 | Fidelity |
| Misty Glen--Lot 2/Block B | 307,000 | 293,739 | Wachovia |
| Misty Glen (Windhorst) | 620,000 | 984,409 | Wachovia |
| McMullen Road / Forest Glen | 950,000 | 887,250 | Wachovia |
| Total | 6,769,500 | 8,591,438 | --- |

In 2009 Paragon continued to attempt to sell properties, complete construction on properties, and settle its claims in order to reduce exposure to

[*6] obligations on the mortgages.  On May 12, 2009, Paragon initiated the process to build a single-family home on Walden Reserve--Lot 8/Block 2.  On September 9, 2009, petitioner, Paragon, and BB&T entered into a "Settlement Agreement and Release Of Claims" whereby petitioner paid BB&T $160,000 to settle all claims attributable to the mortgage loans encumbering the following properties:  Massaro II / Meadow Chase, Amberwave Estates--Lot 1, and Walden Reserve--Lot 11/ Block 2.  On September 25, 2009, the property at Walden Reserve--Lot 15/ Block 2 was sold for $239,000.  The proceeds from the sale were used to pay the full amount of the mortgage loan held by Fidelity.  On October 12, 2009, petitioner, Paragon, and Platinum Bank entered into a "Mutual General Release" agreement whereby petitioner paid Platinum Bank $275,000 to settle all claims attributable to its outstanding mortgage loans, including the remainder of the debt on the Huntley property.  On October 29, 2009, the property at Misty Glen--Lot 5/Block B was sold and the proceeds were used to pay the full amount of the mortgage loan held by Fidelity.

Although petitioner and Paragon were relieved of all mortgage obligations with Platinum Bank and BB&T at the end of 2009, they were both personally liable for mortgage loans with Fidelity and Wachovia at that time.  In order to protect his personal assets from creditors, petitioner established a family limited

**[\*7]** partnership, the Harvey L. Tucker Family LLLP (Tucker LLLP). On December 9, 2009, Paragon transferred $400,267 to petitioner and petitioner used the money to fund Tucker LLLP. On December 28, 2009, Paragon directly transferred $358,255 to Tucker LLLP.

On March 1, 2010, Fidelity filed a foreclosure suit against petitioner and Paragon with respect to the Walden Reserve Vacant Lot properties. The suit was filed in the Circuit Court for Hillsborough County, Florida as case No. 10-CA-004632.

In September 2010 Wells Fargo Bank, as successor to Wachovia, filed a foreclosure suit in the Circuit Court for Hillsborough County, Florida, case No. 10-CA-018534, against petitioner and Paragon. The suit covered properties at Walden Reserve--Lot 19/Block 1, Misty Glen (Windhorst), and McMullen Road/ Forest Glen.

Paragon continued its efforts to reduce exposure to obligations on the mortgages in 2010. On July 28, 2010, the property at Walden Reserve--Lot 3/ Block 2 was sold for $210,000 and the proceeds were used to pay the full amount of the mortgage loan held by Fidelity for this property. In October 2010 Paragon

[*8] initiated the process to build a single-family home on Walden Reserve--Lot 19/Block 1.

For the 2008 tax year Paragon filed a Form 1120S, U.S. Income Tax Return for an S Corporation, and reported a loss of $10,848,924. The loss consisted mainly of an $8,928,845 writedown of Paragon's properties but also included a $283,146 interest expense deduction, a $35,910 depreciation deduction, and a $70,596 deduction for financial fees. After taking into account his basis in Paragon, petitioner claimed a $6,782,852 flow-through loss from Paragon and reported a total loss of $6,722,888 on his 2008 individual income tax return.

Petitioner elected to carry back the loss from 2008 to tax years 2003-06 on his Form 1045, Application for Tentative Refund.[4] As a result, petitioner claimed refunds of $314,647, $781,712, $714,979, and $151,190 for tax years 2003-06, respectively. Petitioner also reported a net loss on his 2009 individual income tax return but did not elect to use extended carryback periods for this loss.[5]

---

[4]The American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, sec. 1211(a), 123 Stat. at 335, amended sec. 172(b)(1)(H) to allow a taxpayer to elect to carry back a 2008 net operating loss attributable to an eligible small business for a period of three, four, or five years instead of the usual two years. Respondent does not dispute that Paragon was an eligible small business, nor does respondent dispute petitioner's claimed loss carryback to the 2003 tax year.

[5]The Worker, Homeowner, and Business Assistance Act of 2009, Pub. L.

(continued...)

**[\*9]** An accountant prepared petitioner's and Paragon's returns for 2008 and the years at issue.

OPINION

## I.    Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934); <u>see</u> Rule 142(a). As a part of that burden, a taxpayer is required to maintain adequate records to establish the amount of any deduction claimed. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. A filed Federal income tax return does not provide adequate substantiation of net operating loss deductions. <u>Lawinger v. Commissioner</u>, 103 T.C. 428, 438 (1994).

---

[5](...continued)
No. 111-92, sec. 13(a), 123 Stat. at 2992, amended sec. 172(b)(1)(H)(i) to permit a taxpayer to elect to carry back a net operating loss for the 2009 tax year to three, four, or five years instead of the usual two years. The election under this section is required to be made in a manner prescribed by the Secretary, and must be made by the due date (including extensions) for filing the return for the taxpayer's last taxable year beginning in 2009. <u>See</u> sec. 172(b)(1)(H)(iii).

**[*10]** II.    Petitioner's Claimed Net Operating Loss Deduction From 2008

Petitioner claimed a net operating loss deduction for tax year 2008 and elected to carry back the loss to tax years 2003-06.  Most of this loss comes by way of petitioner's wholly owned S corporation, Paragon.  At the end of 2008 Paragon wrote down the value of its real property holdings because of the decline in the real estate market at that time.  Petitioner justifies this writedown by arguing that Paragon abandoned the properties in 2008 or, in the alternative, that the properties became worthless deduction.  Paragon also claimed other expense deductions on its 2008 Form 1120S such as an interest expense deduction, a depreciation deduction, and a deduction for financial fees.  Respondent disallowed these deductions and Paragon's writedown of its real property holdings in 2008.  As a result, respondent adjusted the amount of loss petitioner could deduct for this year.

A.    Paragon's Claimed Section 165(a) Loss

Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise.  In order for the loss to be deductible, it must be "evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year."  Sec. 1.165-1(b), Income Tax Regs.  In most cases a "closed and completed

**[*11]** transaction[]" will occur upon a sale or other disposition of property. In some cases, however, a "closed and completed transaction[]" may be satisfied if the taxpayer abandons an asset or the asset becomes worthless. See Proesel v. Commissioner, 77 T.C. 992, 1005-1006 (1981); Shields v. Commissioner, T.C. Memo. 1987-495.

A section 165 loss for abandonment requires both an intent to abandon the asset and an affirmative act of abandonment. Citron v. Commissioner, 97 T.C. 200, 208-209 (1991); Equity Planning Corp. v. Commissioner, T.C. Memo. 1983-57. Mere nonuse alone is not sufficient to accomplish abandonment. See Zurn v. Commissioner, T.C. Memo. 1996-386. A section 165 loss for worthlessness of mortgaged property requires worthlessness of the taxpayer's equity in the property. Commissioner v. Abramson, 124 F.2d 416 (2d Cir. 1942); Laport v. Commissioner, T.C. Memo. 1980-355, aff'd, 671 F.2d 1028 (7th Cir. 1982). When a taxpayer's real property is secured by a recourse obligation, the taxpayer is not entitled to a loss deduction until the year of the foreclosure sale, regardless of whether the taxpayer claims to have abandoned the property in a prior year or claims the property became worthless in a prior year. Helvering v. Hammel, 311 U.S. 504, 512 (1941); George v. United States, 124 F.3d 216, 80 A.F.T.R.2d (RIA) 97-6286 (10th Cir. 1997); Commissioner v. Green, 126 F.2d 70, 71-72 (3d

[*12] Cir. 1942); <u>Middleton v. Commissioner</u>, 77 T.C. 310, 323 (1981) (recognizing the difference between real property subject to recourse debt and nonrecourse debt for purposes of an abandonment loss), <u>aff'd</u>, 693 F.2d 124 (11th Cir. 1982).

Although petitioner admits that Paragon's mortgage obligations were recourse obligations, he argues that Paragon's investments in its properties were "closed and completed" at the end of 2008 because it was impossible for Paragon to spend additional money on its properties or pay any money towards a deficiency judgment at that time or thereafter. Petitioner argues that any money subsequently invested in the properties or paid to the banks came from his own pocket, not from Paragon, because he was personally liable for the mortgage loans as a result of his guaranties. In essence petitioner argues that the facts and circumstances of his case distinguish it from other cases involving recourse loans. Therefore, petitioner believes that the general rule precluding a loss deduction until foreclosure in cases involving recourse debt should not apply.

To bolster his argument, petitioner claims the proper test for a "closed and completed" transaction is whether, under the facts and circumstances, the taxpayer will receive funds in reimbursement--i.e., from insurance or another party. Where a taxpayer suffers a casualty loss, the loss may be closed and completed if there is

**[*13]** no reasonable prospect of reimbursement from the taxpayer's insurer or a third party liable for the casualty loss. See sec. 1.165-1(d)(2), Income Tax Regs. Petitioner argues the inverse: Because Paragon could not reimburse its lenders in the year it sustained its purported losses, Paragon's loss was closed and completed. This argument confuses the test for "closed and completed transactions" with respect to casualty losses and losses on land due to abandonment and worthlessness of the property. Paragon's loss was not a casualty loss. With respect to a "casualty or other event [that] occurs which may result in a loss", the test turns on whether the taxpayer has a reasonable prospect of recovery. See id. subdiv. (i). Here, petitioner argues that the banks could not reasonably expect recovery of their loans. Petitioner's argument mistakes the taxpayer for the banks and he does not point to any caselaw which interpret the regulations in the manner he claims. We decline to be the first.

Furthermore, petitioner's argument is simply not true. Paragon had funds in 2008 that petitioner transferred a year later to his family limited partnership, Tucker LLLP, as a way to preclude reimbursement to lenders. Specifically, on December 9, 2009, Paragon transferred $400,267 to petitioner and petitioner used the money to establish Tucker LLLP. On December 28, 2009, Paragon transferred $358,255 directly to Tucker LLLP. Therefore the facts and circumstances of

**[*14]** petitioner's case show that a deficiency judgment against Paragon was not "impossible" as petitioner claims.

Paragon was personally liable for the mortgage loans regardless of whether it could pay. This meant that the banks could go after Paragon for the remainder of the debt if the proceeds from foreclosure were inadequate to cover Paragon's debt obligations. Even so, a taxpayer's equity in mortgaged property for which the taxpayer is personally liable is not worthless before a foreclosure sale because "the property continues * * * to have some value which, when determined by the sale, bears directly upon the extent of the owner's liability for a deficiency judgment." Commissioner v. Green, 126 F.2d at 71-72; L & C Springs Assocs. v. Commissioner, T.C. Memo. 1997-469, aff'd, 188 F.3d 866 (7th Cir. 1999). Therefore, Paragon's properties continued to have value before their respective foreclosure sales in 2009 and 2010 even if, as petitioner claims, Paragon had no additional funds to reimburse its lenders.

Finally, the record does not indicate that any of Paragon's properties were abandoned or became worthless. Instead, the record shows the opposite. For example, in 2009 Paragon initiated the process to build a single-family home on Walden Reserve--Lot 8/Block 2. Later that year, Paragon entered into settlement agreements with BB&T and Platinum Bank to settle all claims related to the

[*15] mortgaged properties with these banks. Paragon also sold two properties in that year and used the proceeds to satisfy mortgage loans held by Fidelity. In July 2010 Paragon sold another property and used the proceeds to satisfy the mortgage loan held by Fidelity. Later that year Paragon initiated the process to build another single-family home on one of its lots. These subsequent attempts in 2009 and 2010 to sell the properties, construct homes, and settle claims with the banks show that Paragon did not abandon the properties. Furthermore, the properties could be used to reduce Paragon's liability exposure for a deficiency judgment. Hence, the properties were not worthless to Paragon at the end of 2008. Even petitioner's expert testified that the properties were not completely worthless at the end of 2008 and that there was some demand for the properties at that time.

In summary, petitioner has not met his burden to establish the abandonment or worthlessness of Paragon's properties before the foreclosure sale.

B.    Additional Items Making Up Paragon's Claimed Loss

On its 2008 Form 1120S, Paragon claimed a $283,146 interest expense deduction, a $35,910 depreciation deduction, and a $70,596 deduction for financial fees. Respondent disallowed $20,819 of the depreciation deduction and $110,220 of the interest expense deduction. Respondent also disallowed the entire deduction for financial fees. Respondent determined that the financial fees should

[*16] be capitalized and included in computing Paragon's ending inventory, rather than deducted.

Petitioner did not meet his burden of proof with respect to these deductions. See Rule 142(a)(1). Instead petitioner briefed the Court on several expenses Paragon may have incurred in 2009. Specifically, petitioner claims Paragon incurred a deductible expense in 2009 for compensation for services provided by a third party. Petitioner also claims a property sale deduction for model home furnishings sold by Paragon's employees in 2009. Since the 2009 tax year has not been shown to have an effect on the years at issue in this case--i.e., 2004-06--we decline to discuss these expenses.

One item from 2009 pertains to this case: In his examination report for Paragon for tax year 2008, respondent determined that the remainder of the debt pertaining to the mortgage on the Huntley property was forgiven in 2008 when the property was sold, rather than 2009 when Paragon entered into a "Mutual General Release" agreement with Platinum Bank. Therefore, respondent determined that Paragon had cancellation of indebtedness income for 2008. Although cancellation of indebtedness income is properly excludable from gross income when the taxpayer is insolvent, the amount excluded reduces the taxpayer's tax attributes, starting with net operating losses. See sec. 108(a)(1)(B); sec. 1.108-7(a)(1),

[*17] Income Tax Regs. We hold that the remainder of the debt pertaining to the Huntley property was canceled at the time of the "Mutual General Release" agreement in 2009, rather than 2008. Therefore, a Rule 155 computation will be needed to calculate the amount of petitioner's allowable net operating loss for tax year 2008.

Finally, petitioner claimed a net loss for the 2009 tax year, but he did not elect to extend the carryback of the loss to more than two years. Therefore, any deductions petitioner claimed to generate this net loss do not have any bearing on 2004-06, the tax years before the Court.

In summary, we hold that petitioner was not entitled to deduct the amounts of net operating loss carryback he claimed from tax year 2008 for tax years 2004-06.

II.     Section 6662(a) Penalty

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax which is attributable to a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

**[*18]** Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). The understatement of income tax is greater than 10% of the tax required to be shown on petitioner's returns for each of the years at issue, which is greater than $5,000 for each of these years. Thus, respondent's burden of production has been satisfied.

Once the Commissioner has met the burden of production, the taxpayers must come forward with persuasive evidence that the penalty is inappropriate because, for example, they acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty. United States v. Boyle, 469 U.S. 241, 251 (1985). A taxpayer's reliance on a competent tax professional may establish reasonable cause and good faith when the taxpayer provides necessary and accurate information to the adviser and actually relies in

**[\*19]** good faith on the adviser's judgment.  See Longino v. Commissioner, 593

Fed. Appx. 965, 970 (11th Cir. 2014), aff'g T.C. Memo. 2013-80; Neonatology

Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d

Cir. 2002).  In addition, the advice must not be based on unreasonable factual or

legal assumptions (including assumptions as to future events) and must not

unreasonably rely on the representations, statements, findings, or agreements of

the taxpayer or any other person.  Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

To the extent that the penalty is attributable to a substantial understatement

of income tax under section 6662(b)(2), it may be reduced if (1) the taxpayer's

position is supported by "substantial authority" or (2) relevant facts are adequately

disclosed in a statement attached to the return and the taxpayer's position has a

reasonable basis.  Sec. 6662(d)(2)(B).

Petitioner argues that the amount of his penalty should be reduced because

he had substantial authority for his reported loss for 2008.  However, petitioner's

return position runs contrary to established caselaw and regulations on loss

deductions for depreciable property secured by recourse financing.  Furthermore,

the cases petitioner cites to support his position--mainly Helvering v. Gordon, 134

F.2d 685 (4th Cir. 1943) (property interest shown by identifiable events to have

become worthless), aff'g 46 B.T.A. 1201 (1942), Echols v. Commissioner, 935

**[\*20]** F.2d 703 (5th Cir. 1991) (property subject to nonrecourse debt), rev'g 93 T.C. 553 (1989), and Middleton v. Commissioner, 77 T.C. 310 (property subject to nonrecourse debt)--are materially distinguishable from his case.  See Ackerman v. Commissioner, T.C. Memo. 2009-80.  Therefore, we reject petitioner's substantial authority argument.

Petitioner also argues that he acted with reasonable cause and in good faith. Petitioner does not argue that he relied on his accountant in claiming a substantial net operating loss carryback deduction for the 2008 tax year.  He merely asks the court to find reasonable cause for the reported loss and find that he acted in good faith.  Without more, we cannot say that petitioner acted with reasonable cause and in good faith.  See Green v. Commissioner, 507 F.3d 857, 872 (5th Cir. 2007), aff'g T.C. Memo. 2005-250.

Accordingly, we hold that petitioner is liable for the section 6662(a) accuracy-related penalty for tax years 2004-06.

To reflect the foregoing,

Decision will be entered

under Rule 155.
